IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 9, 2019

## QUINCY HOWZE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 10-02660      James M. Lammey Jr., Judge**

### No. W2018-02046-CCA-R3-PC

A Shelby County jury convicted the Petitioner, Quincy Howze, of aggravated robbery, and the trial court sentenced him as a Range II offender to serve twenty years at 100%. The Petitioner appealed his convictions and sentence to this court, and we affirmed the judgments. *State v. Quincy Howze*, No. W2014-02449-CCA-R3-CD, 2015 WL 9173701 (Tenn. Crim. App., at Jackson, Dec. 15, 2015), *perm. app. denied* (Tenn. May 6, 2016). The Petitioner filed a timely petition for post-conviction relief, which the post-conviction court denied after a hearing. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and J. ROSS DYER, JJ., joined.

Terrell L. Tooten, Cordova, Tennessee, for the appellant, Quincy Howze.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Franscisco Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts and Background

This case originates from the Petitioner's robbery of a man in the parking lot of a liquor store in Memphis, Tennessee.

### A. Trial

The following is a summary by this court of the facts presented at trial:

Cory Minga, the owner of F & G Liquors . . . testified that in addition to selling liquor, the store's business also included cashing checks. On July 22, 2009, around 9:00 a.m., Mr. Minga was working when a customer with whom he was acquainted, John McGee (the victim), entered the store and cashed a check. Shortly thereafter, the victim re-entered the store, pale-faced and shaken, and informed Mr. Minga that he had just been robbed in the parking lot. Mr. Minga called 9-1-1 and reported the robbery. Upon questioning by the 9-1-1 operator, Mr. Minga began to relay the answers supplied by the victim, but he then passed the telephone to the victim so that he could answer the questions directly. Mr. Minga recalled that the victim described the gunman as being a young, skinny black male. Officers from the Memphis Police Department ("MPD") subsequently arrived and gathered information from both men regarding the robbery.

Mr. Minga stated that the store was equipped with video surveillance cameras. The recording captured the incident in its entirety. Mr. Minga explained that [the Petitioner] first drove past the liquor store and then backed his car into the parking lot. When the victim exited the store, [the Petitioner] walked up behind him before the victim could enter his truck. Mr. Minga said that [the Petitioner] drove a black four-door car with chrome wheels and mirror-tint on all windows except for the driver's window. Prior to that time, Mr. Minga had never seen a vehicle matching that description in the area of his store. He saw the same car the following week as it was driving down Belt Line Street and turning onto Southern Avenue. Mr. Minga was on the telephone with MPD Officer Veronica Crutchfield at the time, and he indicated to the officer that he had just seen the vehicle. Officer Crutchfield and her partner, Officer Jason Randolph, had responded to the scene of the robbery. Based on that information, [the Petitioner] was subsequently apprehended.

The victim testified that on the morning of the robbery, he checked his post office box and then drove to the store to cash his check. He recalled that as he exited the store, he was about to insert his key into his truck's ignition when someone walked up behind him and said, "'Give me your wallet.'" The victim turned around and observed a silver-plated .357 handgun aimed at his head. The victim complied with the gunman's order,

and the gunman instructed the victim to get into his truck. The gunman threatened, "'[L]ook straight ahead or [I'll] f* * * * * * kill [you].'" The victim stated that the contents of his wallet included $191 in cash, two debit cards, his social security card, his voter registration card, and some photographs. He said he turned over his property because he "had a pistol pointed at [his] head, and [he] feared for his life." He clarified that he was certain of the caliber of the handgun based on his two tours of duty with the United States Marine Corps. The victim described the gunman as wearing a black "doo-rag," a black shirt, and long denim shorts. The gunman wore his hair in "corn [rows]" or braids. He did not wear a mask of any sort or obscure his face.

The victim noted that the gunman drove a black, four-door car with mirrored tint and chrome wheels. He observed that all of the windows were tinted except for the driver's side window, which bore a "regular" or "factory" light tint. After the robbery, the victim re-entered the liquor store, where the owner telephoned 9-1-1 for him. He was permitted to walk behind the glass to converse with the operator. Subsequently, the victim viewed a photographic array administered by Lieutenant Dexter Moses wherein he identified [the Petitioner]. At trial, the victim was shown a black "doo-rag," and he identified it as the one [the Petitioner] was wearing during the robbery. The victim testified that none of his property was returned to him.

The victim acknowledged that at the preliminary hearing, he was unable to identify [the Petitioner]. He attributed that to the fact that [the Petitioner] had changed his appearance. At the hearing, [the Petitioner] had combed back his hair and was wearing glasses.

The State presented prior testimony of Officer Veronica Crutchfield Howard, who could not be present at [the Petitioner's] trial. At the time of the prior testimony, Officer Howard was a sixteen-year veteran of the MPD and was assigned to the Orange Mound community of Memphis. She was on duty on the day of the robbery and responded to F & G Liquor Store where she first observed the victim. She described the victim as "very frantic and upset" after having been robbed by a black male wielding a silver handgun. She and her partner, Officer Randolph, gathered information pertaining to the gunman's description and the car he drove. They broadcast the information and then went inside the store to view the video surveillance footage. In the video, Officer Howard could see the gunman's vehicle as it backed into the parking lot as described by Mr.

3

Minga. She described it as "possibly" a Honda Prelude with mirror tint. The entire robbery was also captured on tape. After viewing the video, Officer Randolph released a second broadcast.

Subsequently, on July 28, Officer Howard was parked on a street behind the liquor store when she saw the gunman's vehicle drive by. She pulled in behind the vehicle and advised officers that she was in pursuit of a vehicle she had observed in connection with a previous robbery. While driving, she telephoned Mr. Minga and told him that the suspect vehicle was driving toward his store. Mr. Minga saw the car at that time and confirmed the identification. Officer Howard lost sight of the gunman's vehicle during the pursuit but regained visual contact with it when officers stopped the vehicle in the vicinity. When she arrived at the scene, [the Petitioner] had already been placed in the back of a squad car. She said that [the Petitioner] was heavier then than he was at the preliminary hearing and that he had braids in his hair at the time of his arrest but not at the hearing. At the hearing, [the Petitioner] was "clean" and "dressed up." He also wore glasses.

Juaquatta Harris, a twenty-four-year employee of the Shelby County Sheriff's Office, stated that her duties involved monitoring and disseminating inmate telephone calls. Through her, a fifteen-minute telephone call that was placed by [the Petitioner] on September 4, 2009, while he was incarcerated, was introduced into evidence. The State "pinpointed" two specific sections of the conversation for the jury. In the first segment, [the Petitioner] is heard to tell the other party that with regard to the victim's identification of him, "They probably showed dude a picture of me." He is later heard to say:

> He ain't gonna be able to pull me out, watch . . . me havin' that blue shirt . . . . I'm 'bout to pick four people to go in there with me . . . on this sit-down hearing . . . . When what's-his-name come in the tank to get me, I'm gonna . . . I want him, him, him, him, to come sit with me . . . . They do not play fair.

MPD Officer Jason Randolph testified next. His testimony was substantially similar to that of Officer Howard; however, he identified from the video surveillance that [the Petitioner's] vehicle was actually a Mitsubishi Gallant rather than a Honda. Based on his identification of the car, Officer Randolph issued a second broadcast containing a correct

4

description. As Officer Howard continued to interview the victim, Officer Randolph and other officers began to canvas the neighborhood looking for the vehicle.

Officer Randolph recalled the events surrounding [the Petitioner's] capture on July 28. He said that he received an excited telephone call from Officer Howard, who had just seen the vehicle. He joined the pursuit of [the Petitioner] and stopped [the Petitioner] shortly thereafter. Officer Randolph learned that [the Petitioner] was driving with a suspended license and then patted him down and placed him in the back seat of the squad car. Officer Randolph observed a black "doo-rag," a black t-shirt, and a pair of gloves in the floorboard of [the Petitioner's] back seat. When he pulled over [the Petitioner], [the Petitioner] wore his hair in braids and did not wear glasses.

On cross-examination, Officer Randolph clarified that based upon the victim's description of [the Petitioner], he issued the first broadcast stating that [the Petitioner] was thin and around 5'9" in height. After viewing the video surveillance, Officer Randolph issued the second broadcast that described [the Petitioner] as stocky with an estimated weight of 230 to 240 pounds. Officer Randolph acknowledged that [the Petitioner's] vital statistics that recorded upon his arrest placed him at 5'5" in height and 175 pounds. He agreed that when [the Petitioner] was arrested, officers did not recover the weapon or any of the victim's personal property.

MPD Lieutenant Dexter Moses testified that he administered the photographic array to the victim. He affirmed that he did not coach the victim in any way and that the victim unequivocally identified [the Petitioner] as the perpetrator within "seconds." Lieutenant Moses stated that at the time of the offense, he attended a meeting with the robbery division of the police department to share information about current cases every morning. There were no other vehicles similar to [the Petitioner's] vehicle involved in any robberies at that time.

*Howze*, 2015 WL 9173701, at *1-3. The jury convicted the Petitioner as charged, and the trial court sentenced him to twenty years to be served at 100%.

## B. Post-Conviction Proceedings

On October 17, 2016, the Petitioner filed a petition for post-conviction relief. In

5

it, he argued that his conviction should be reversed because it was based on a photographic lineup identification, which was insufficient because the victim could not identify him at the preliminary hearing. He also argued that the trial court improperly sentenced him. The post-conviction court appointed the Petitioner counsel, who amended the petition.

The Petitioner's amended petition, filed July 14, 2017, additionally alleged that the Petitioner had received the ineffective assistance of counsel at trial because his trial counsel allowed the victim to testify about his military service and allowed the victim to identify an article of clothing, a "doo rag," worn by the suspect. The Petitioner also contended that trial counsel failed to request a special identity instruction. In a third petition, filed September 13, 2018, the Petitioner additionally alleged that he failed to receive the due process of law because he should have been sentenced as a Range I offender.

At a hearing on the petition and amended petitions, the parties presented the following evidence: The Petitioner contended that his two prior aggravated robbery convictions occurred within a twenty-four hour period and did not include serious or threatened bodily injury, so the trial court should not have considered the convictions separately when determining his sentencing range for his current conviction. He asserted that he should have, therefore, been sentenced as a Range I offender in the present case. The State countered that the robbery convictions stemmed from separate indictments, so they counted as separate convictions, and the Petitioner was therefore properly sentenced.

The Petitioner testified that he had been convicted of aggravated robbery and sentenced as a Range II offender. He said that, when he had previously pleaded guilty to two aggravated robberies, the prosecutor informed him that, since he had been sentenced concurrently for those two convictions, the convictions would appear as one in the future. He said that the prosecutor stated as much in open court and that was the only reason that he pleaded guilty. The Petitioner testified that he informed his trial counsel ("Counsel") of this fact.

The Petitioner further testified that during his first trial on this aggravated robbery charge, which ended in a mistrial, the victim said that the Petitioner had changed his appearance, which was not true. He further noted that, during the preliminary hearing, the judge stated that he had not changed his appearance. Also during the first trial, the victim stated that he was sure he properly identified the Petitioner at the preliminary hearing, but he had not and had identified someone other than the Petitioner. During the second trial, the victim stated that if he had improperly identified the Petitioner at the preliminary hearing then it was because the Petitioner had changed his appearance.

6

During cross-examination, the Petitioner denied that he said in a jail call, "I am going to change my appearance around for the preliminary hearing so I can't be identified." He agreed that, while that recording may have been entered into evidence during his trial, he had actually said that he would not be identified because he did not commit the crime. He maintained that it was a "lie" if the recording indicated anything else. The Petitioner said he did not wear glasses or change his hair before the preliminary hearing. The Petitioner agreed that the victim identified him in a photographic lineup, but he stated that the victim identified the wrong man at the preliminary hearing. The Petitioner said that this fact was brought out in his first trial but not in his second trial.

The Petitioner agreed that he was identified in part because of the unique car that he was driving, but he said that just because he was driving that car did not mean that he committed the robbery.

Counsel testified that he was the Petitioner's trial counsel during the second trial. He agreed that the Petitioner believed he was a Range I offender. Counsel reviewed the Petitioner's convictions and determined that, while they occurred close in time, they were still two separate convictions for aggravated robbery, qualifying the Petitioner as a Range II offender. Counsel said that, at sentencing, the trial court sentenced the Petitioner to twenty years as a Range II offender.

Upon questioning by the post-conviction court, Counsel testified that after the Petitioner's first trial, but before his second, the State offered him a nine-year sentence in exchange for his guilty plea. The Petitioner rejected that offer. Counsel explained that the first trial ended in a hung jury, with eleven jurors finding the Petitioner guilty and one finding him not guilty.

At the conclusion of the hearing, the post-conviction court denied the Petitioner's petition for post-conviction relief. After reviewing the evidence, it found that the Petitioner qualified as a Range II offender and that the Petitioner's counsel had done nothing wrong in that regard. The post-conviction court further found that there was "nothing in the record that show[ed] that [Counsel] gave deficient performance in any respect, on any of the issues."

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition. He maintains that he received the ineffective assistance of counsel because: Counsel failed to articulate to him that he was a Range II offender and, because

7

he did not so do, the Petitioner went to trial and was sentenced as a Range II offender. The Petitioner argues that had he known that he was a Range II offender he would have taken the nine-year plea offer. On appeal, he asserts that he is not a Range II offender. The Petitioner further contends that the misinformation about his sentencing range was a violation of his Due Process rights. The State counters that the Petitioner has waived his claims. The State argues that the Petitioner failed to raise either of these specific claims in his petition for post-conviction relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against it. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

We begin by noting that the Petitioner did not raise either of these specific issues as grounds for relief in his petition for post-conviction relief or at the post-conviction hearing. Instead, he limited his argument to whether Counsel was ineffective for allowing the victim to testify about his military service and a "doo rag" worn by the

suspect and whether Counsel failed to request a special identity instruction. The only testimony offered in this regard included the Petitioner's testimony that, when he had previously pleaded guilty to two aggravated robberies, the prosecutor informed him that, since he had been sentenced concurrently, those two convictions would appear as one in the future. He said that the prosecutor stated as much in open court and that was the only reason that he pleaded guilty. The Petitioner testified that he informed his Counsel of this fact. The Petitioner did not testify at the hearing that Counsel improperly informed him of his sentencing range or that the only reason he went to trial was because he thought he was a Range I offender. Counsel, in fact, testified that he reviewed the Petitioner's convictions and determined the Petitioner qualified as a Range II offender. The issues are waived because they were not raised below. *See* T.C.A. § 40-30-106(g); *State v. Turner*, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995) ("A party may not raise an issue for the first time in the appellate court.").

Notwithstanding waiver, we conclude that the Petitioner's claim is without merit. The post-conviction court reviewed the convictions and determined the Petitioner qualified as a Range II offender and that Counsel had done "nothing wrong" in that regard. We also have reviewed the transcript and conclude that the Petitioner was properly sentenced and that there is no clear and convincing evidence that he was misinformed of his sentencing range. As such, we conclude that he is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the post-conviction court properly denied the Petitioner's petition for post-conviction relief. In accordance with the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE